FILED
U.S. DISTRICT COURT
INDIANAPOLIS DIVISION

14 OCT 31  PM 2: 46

SOUTHERN DISTRICT
OF INDIANA
LAURA A. BRIGGS
CLERK

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
### INDIANAPOLIS DIVISION

|  |  |
|---|---|
| VICTOR VELOSO, Derivatively on Behalf of ENDOCYTE, INC., )<br><br>Plaintiff, )<br><br>vs. )<br><br>JOHN C. APLIN, KEITH E. BRAUER, P. RON ELLIS, COLIN GODDARD, ANN F. HANHAM, MARC KOZIN, PHILIP S. LOW, PETER D. MELDRUM FRED A. MIDDLETON, and LESLEY RUSSELL COOPER, )<br><br>Defendants, )<br><br>and, )<br><br>ENDOCYTE, INC., )<br><br>Nominal Defendant. ) | Case No:<br><br>**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL**<br><br>**1 : 14 -cv- 1 7 8 7 SEB -DML** |

Plaintiff Victor Veloso ("Plaintiff"), by and through his undersigned counsel, derivatively

on behalf of Nominal Defendant Endocyte, Inc. ("Endocyte" or the "Company"), submit this

Verified Shareholder Derivative Complaint (the "Complaint"). Plaintiff's allegations are based

upon his personal knowledge as to himself and his own acts, and upon information and belief,

developed from the investigation and analysis by Plaintiff's counsel, including a review of

publicly available information, including filings by Endocyte with the U.S. Securities and

Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor

conference transcripts, publicly available filings in lawsuits, and matters of public record.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action brought in the right, and for the benefit, of Endocyte against certain of its officers and directors seeking to remedy the Individual Defendants' (as defined below) breach of fiduciary duties and gross mismanagement that occurred between March 21, 2014 and May 2, 2014 (the "Relevant Period") and have caused substantial harm to Endocyte.

## JURISDICTION AND VENUE

2.      This Court has jurisdiction over the claims asserted herein under 28 U.S.C. § 1332 because there is complete diversity among the parties and the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.

3.      Venue is proper in this Court because the Company maintains its executive office in this county, a substantial portion of the transactions and wrongs complained of herein occurred in this county, and the Individual Defendants have received substantial compensation in this county by doing business here and engaging in numerous activities that had an effect in this county.

## PARTIES

4.      *Plaintiff Victor Veloso* is, and was at relevant times, a shareholder of Endocyte. Plaintiff will fairly and adequately represent the interests of the shareholders in enforcing the rights of the corporation.

5.      *Nominal Defendant Endocyte* is a biopharmaceutical company that develops targeted small molecule drug conjugates ("SMDCs") and companion imaging agents for personalized therapy in cancer and other serious diseases.  The Company's primary SMDC candidate is VYNFINIT (vintafolide).  For years the Company has focused on treating platinum-

2

resistant ovarian cancer ("PROC") with vintafolide using testing methods known as response evaluation criteria in solid tumors ("RECIST"). RECIST is a set of published rules that define when tumors in cancer patients improve ("respond"), stay the same ("stabilize"), or worsen ("progress") during treatments. The criteria were initially published in February 2000 ("RECIST 1.0") and subsequently updated in January 2009 ("RECIST 1.1"). RECIST 1.1 criteria are substantially more targeted than RECIST 1.0, and require significantly stricter parameters, guidelines, and analysis, including with respect to the: (i) number of lesions to be assessed; (ii) assessment of pathological lymph nodes; (iii) confirmation of responses; (iv) disease progression evaluation; and (v) imaging guidance.

6.      **Defendant P. Ron Ellis** ("Ellis") was, at all relevant times, the Company's President and Chief Executive Officer ("CEO"), and a member of the Board of Directors ("Board").

7.      **Defendant Philip S. Low** ("Low") was, at all relevant times, a Board member and the Chief Science Officer of the Company. Low was also one of the founders of the Company.

8.      **Defendant Lesley Russell Cooper** ("Russell") was, at all relevant times, a Board member and a member of the Nominating and Corporate Governance Committee.

9.      **Defendant Peter D. Meldrum** ("Meldrum") was, at all relevant times, a Board member and the Chairman of the Compensation Committee.

10.     **Defendant Keith E. Brauer** ("Brauer") was, at all relevant times, a member of the Board and the Chairman of the Audit Committee.

11.     **Defendant Colin Goddard** ("Goddard") was, at all relevant times, a Board member since 2013 and a member of the Compensation Committee.

12.     **Defendant Ann F. Hanham** ("Hanham") was, at all relevant times, a Board

3

member and the Chairman of the Nominating and Corporate Governance Committee.

13. **Defendant Marc Kozin** ("Kozin") was, at all relevant times, a Board member and is a member of the Compensation Committee and Nominating and Corporate Governance Committee.

14. **Defendant Fred A. Middleton** ("Middleton") was, at all relevant times, a Board member and a member of the Audit Committee.

15. **Defendant John C. Aplin** ("Aplin") was, at all relevant times, the Chairman of the Board and a member of the Audit Committee.

16. Defendants Ellis, Low, Russell, Meldrum, Brauer, Goddard, Hanham, Kozin, Middleton, and Aplin are collectively referred to hereinafter as the "Individual Defendants."

## CODE OF BUSINESS CONDUCT AND ETHICS

17. As members of Endocyte's Board, the Individual Defendants were held to the highest standards of honesty and integrity and charged with overseeing the Company's business practices and policies, and assuring the integrity of its financial and business records.

18. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Endocyte, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its investors that the Individual Defendants were aware posed a risk of serious injury to the Company.

## DUTIES OF THE INDIVIDUAL DEFENDANTS

19. By reason of their positions as officers and/or directors of the Company, and because of their ability to control the business and corporate affairs of Endocyte, the Individual Defendants owed Endocyte and its investors the fiduciary obligations of trust, loyalty, and good

faith. The obligations required the Individual Defendants to use their utmost abilities to control and manage Endocyte in an honest and lawful manner. The Individual Defendants were and are required to act in furtherance of the best interests of Endocyte and its investors.

20.     Each director of the Company owes to Endocyte and its investors the fiduciary duty to exercise loyalty, good faith, and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets. In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's operations, finances, and financial condition, as well as present and future business prospects, so that the market price of the Company's stock would be based on truthful and accurate information.

21.     To discharge their duties, the officers and directors of Endocyte were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the affairs of the Company. By virtue of such duties, the officers and directors of Endocyte were required to, among other things:

(a)     ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

(b)     conduct the affairs of the Company in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's business prospects, and ensuring that the Company

5

maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(d)     remain informed as to how Endocyte conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiries in connection therewith, take steps to correct such conditions or practices, and make such disclosures as necessary to comply with federal and state securities laws;

(e)     ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state and local laws, and rules and regulations; and

(f)     ensure that all decisions were the product of independent business judgment and not the result of outside influences or entrenchment motives.

22.     Each Individual Defendant, by virtue of his position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of Endocyte, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware, or should have been aware, posed a risk of serious injury to the Company.

23.     The Individual Defendants breached their duties of loyalty and good faith by causing the Company to issue false and misleading statements concerning the financial condition

6

of the Company. As a result, Endocyte has expended, and will continue to expend, significant sums of money related to investigations and lawsuits.

## SUBSTANTIVE ALLEGATIONS

### Background

24. In April 2012, the Company and Merck Sharp & Dohme Research GmbH, a subsidiary of Merck, entered into a $1 billion partnership for VYNFINIT, a medicine designed by the Company to purportedly deliver "a potent vinca alkaloid chemotherapy directly to cancer cells by targeting the folate receptor expressed on cancer cells, but not on most normal cells." Pursuant to the partnership, the Company granted Merck an exclusive license to develop, manufacture, and commercialize VYNFINIT, and Merck and the Company agreed to co-promote VYNFINIT in the United States upon approval by the FDA. Further, the Company was responsible for conducting a Phase 3 PROCEED Study, as well as another study concerning a certain type of lung cancer.

25. The Company began the PROCEED Study in the first half of 2011. Unlike an earlier "PRECEDENT" Study, the PROCEED Study used the more rigorous RECIST 1.1. As a result, the PROCEED Study faced substantially higher hurdles than the PRECEDENT Study in demonstrating VYNFINIT's effectiveness.

### Materially False and Misleading
### Statements Issued During the Period

26. The Individual Defendants misled the public concerning the Company's financial condition and business prospects, specifically relating to the development of the Company's lead SMDC candidate, vintafolide. The Individual Defendants caused to be made misleading statements immediately prior to filing a public offering to sell 4.5 million shares. After years of research and seven months into the PROCEED Study, the Individual Defendants knew that

vintafolide was ineffective at treating PROC, and knew that the truth would soon be revealed by the DSMB. The Individual Defendants quickly acted to take advantage of their knowledge.

27.     On March 21, 2014, the Individual Defendants caused the Company to issue a press release announcing that CHMP issued "positive opinions" for the "Conditional Marketing Authorisations" of VYNFINIT (vintafolide) and companion imaging components for the treatment of adult patients with PROC. The Company press release was filled with glowing quotes concerning how the CHMP brought the Company closer to really selling VYNFINIT. The press release failed to disclose that years of testing under the more rigorous RECIST 1.1 standard (as opposed to previous testing under the RECIST 1.0 standard which formed the basis for CHMP's opinion) had revealed that vintafolide was ineffective for treating PROC and thus, it would not be sold commercially. The press release stated, in relevant part:

> **Merck and Endocyte Announce European CHMP Positive Opinions for VYNFINIT® (vintafolide) and Companion Imaging Agents FOLCEPRI® (etarfolatide) and NEOCEPRI® (Intravenous (IV) folic acid) in Patients with Platinum-Resistant Ovarian Cancer**
>
> . . . Merck (NYSE: MRK), known as MSD outside the United States and Canada, and Endocyte, Inc. (NASDAQ:ECYT), today announced that the Committee for Medicinal Products for Human Use (CHMP) of the European Medicines Agency (EMA) has issued positive opinions for the Conditional Marketing Authorisations of VYNFINIT® (vintafolide) and companion imaging components, imaging agent FOLCEPRI® (etarfolatide), and NEOCEPRI® (intravenous (IV) folic acid), for the treatment of adult patients with folate receptor-positive, platinum-resistant, ovarian cancer, in combination with pegylated liposomal doxorubicin (PLD).
>
> *"These positive CHMP opinions bring Merck and Endocyte one step closer to providing a personalized approach to address a significant unmet medical need in platinum-resistant ovarian cancer,"* said Dr. Eric Rubin, vice president, Clinical Development for Oncology, Merck Research Laboratories. "We want to acknowledge our colleagues at Endocyte for their pioneering work

in this field, and look forward to the European Commission completing their review of the applications."

"Vintafolide is a folate receptor targeted agent, and if approved, would be the first oncology therapeutic to employ an imaging agent as a companion diagnostic for patient selection," said Ron Ellis, Endocyte's president and CEO. *"Today's positive CHMP opinions are an important step toward personalizing ovarian cancer management for appropriate patients, and validate our Company's focus on the development of targeted medicines and companion imaging agents designed to improve patient outcomes."*

Vintafolide is proposed for use in combination with PLD for the treatment of adult patients with platinum-resistant ovarian cancer who express the folate receptor on all target lesions. Folate receptor status should be assessed by a diagnostic medicinal product approved for the selection of adult patients for treatment with vintafolide, using Single Photon Emission Computed Tomography (SPECT) imaging, in combination with Computed Tomography (CT) or Magnetic Resonance Imaging (MRI).

Etarfolatide and IV folic acid are medicinal products proposed for diagnostic use only. Etarfolatide, following radio labelling with sodium pertechnetate (99mTc) solution, is proposed for SPECT imaging in combination with CT or MRI, for the selection of adult patients for treatment with vintafolide. Intravenous folic acid would be administrated prior to 99mTc-etarfolatide for the enhancement of SPECT image quality.

*The applications for Conditional Marketing Authorisation for vintafolide, etarfolatide and IV folic acid were submitted based on results in platinum-resistant ovarian cancer patients who express the folate receptor on all target lesions as evaluated in the PRECEDENT Phase 2 study* (ClinicalTrials.gov Identifier: NCT00722592).

The CHMP positive opinions will be reviewed by the European Commission (EC). If approved, the EC grants a centralized marketing authorization with unified labeling that is valid in the 28 countries that are members of the European Union, as well as European Economic Area members Iceland, Liechtenstein and Norway. The EC usually issues a final legally binding decision within three months of a CHMP Opinion.

**About vintafolide, etarfolatide and IV folic acid**

Vintafolide is an investigational conjugate of folic acid (vitamin B9) linked to an anti-cancer agent, the potent vinca alkaloid desacetylvinblastine hydrazide (DA VLBH). Since cancer cells generally consume higher levels of folate than normal cells to fuel their growth, some cancer cell types -- including ovarian -- have high concentrations of the folate receptor on their surface. Vintafolide is designed to selectively target the folate receptor to deliver the anti-cancer agent to the cancerous tissue. Tumors that have high concentrations of the folate receptor are identified by etarfolatide, a non-invasive imaging diagnostic agent. Intravenous folic acid is used with 99mTc-etarfolatide for the enhancement of image quality.

Vintafolide, etarfolatide and IV folic acid have been granted orphan drug status by the EMA. The U.S. Food and Drug Administration has also granted orphan drug status to vintafolide and etarfolatide. Further evaluation is ongoing in the global PROCEED Phase 3 clinical trial in folate receptor-positive (FR 100%), platinum resistant ovarian cancer (ClinicalTrials.gov Identifier: NCT01170650). The randomized TARGET Phase 2b study of vintafolide in non-small cell lung cancer has completed enrollment (ClinicalTrials.gov Identifier: NCTO 1577654), and a Phase 2 study in triple-negative breast cancer is expected to be initiated in Q2 (ClinicalTrials.gov Identifier: NCTO 1953536.

### About Folate Receptor-Positive Platinum-Resistant Ovarian Cancer

In 2012, it was estimated that there would be over 40,000 new cases of ovarian cancer in the European Union. Ovarian cancer is one of the most lethal cancers of the female reproductive system. Overall, approximately 80 percent of patients relapse after first-line, platinum-based, chemotherapy. Platinum-resistant ovarian cancer, also known as PROC, is a challenging disease with a high unmet need for new treatments. This type of cancer recurs within six months of completion of a platinum containing regimen, the standard of care for ovarian cancer. An estimated 80 percent of platinum-resistant ovarian cancer patients have been found to have folate receptorpositive disease, and approximately 40 percent express the receptor, as detected by etarfolatide, in all of their target tumor lesions (FR 100%). Compared to patients who do not express folate receptors on their tumors, folate receptor-positive patients have been shown to have a poorer overall prognosis.

(Emphasis added).

10

28.     Also on March 21, 2014, the Company held a conference call with analysts and investors to boast that as a result of CHMP's positive opinion, VYNFINIT would likely go on sale in at least twenty-eight (28) countries within two to three months.   In particular, the Company's CEO, Ellis, stated:

> Let me just first talk about the CHMP.   Based on the opinion which was announced today, *we expect that the EMA will grant the conditional marketing authorization for the two products or the products in the 28 countries in the EU probably in two to three months*.
>
> We are ready to launch. We have -- *both Merck and Endocyte have their teams in place and have been preparing for the potential approval.*

(Emphasis added).

29.     On the above news, the Company's stock price skyrocketed, jumping 94% in a single day, from $14.64 to $28.17.

30.     Some of the Individual Defendants immediately took advantage of the stock jump by initiating a public offering to quickly sell Endocyte shares at an inflated price.  On March 25, 2014, just four days after announcing the purportedly good news, the Company filed a Shelf Registration Statement on Form S-3 with the SEC, which incorporated a Preliminary Prospectus on Form 424B5 to offer 4.5 million shares of common stock.  The Form S-3 was signed by Ellis. The prospectus again touted CHMP's "positive opinions" for the "Conditional Marketing Authorisations of VYNFINIT® (vintafolide)" and further boasted that if the opinion is approved by the European Commission, the drug could soon go on sale in twenty-eight countries.  The preliminary prospectus stated, in relevant part:

### Recent Developments

CHMP Positive Opinions

On March 21, 2014, we and our collaboration partner for vintafolide, Merck Sharp & Dohme Research GmbH, or Merck, announced that the Committee for Medicinal Products for Human Use, or CHMP, of the EMA has issued positive opinions for the Conditional Marketing Authorisations of VYNFINIT® (vintafolide) and companion imaging components, imaging agent FOLCEPRI ® (etarfolatide), and NEOCEPRI ® (IV folic acid), for the treatment of adult patients with folate receptor-positive platinum-resistant ovarian cancer, in combination with pegylated liposomal doxorubicin, or PLD.

Vintafolide is proposed for use in combination with PLD for the treatment of adult patients with platinum-resistant ovarian cancer who express the folate receptor (FR) on all target lesions. The applications for Conditional Marketing Authorisation for vintafolide, etarfolatide and IV folic acid were submitted based on results in platinum-resistant ovarian cancer patients who express the folate receptor on all target lesions as evaluated in the PRECEDENT Phase 2 study (ClinicalTrials.gov Identifier: NCT00722592).

The CHMP positive opinions will be reviewed by the European Commission, or EC. If approved, the EC grants a centralized marketing authorization with unified labeling that is valid in the 28 countries that are members of the European Union, as well as European Economic Area members Iceland, Liechtenstein and Norway. The EC usually issues a final legally binding decision within three months of a CHMP opinion.

31. On March 28, 2014, the Company filed a final prospectus with the SEC. The final prospectus was identical to the preliminary prospectus with respect to CHMP's "positive opinions," as stated above.

32. The public offering was completed on April 2, 2014. In a few short days, the Company issued more than 5.1 million shares, reaping net proceeds of approximately $101.8 million.

**REASONS THE STATEMENTS WERE FALSE AND MISLEADING**

33. The true facts, which were known by the Individual Defendants but concealed

from the investing public during the Relevant Period, were that:

    (a)    Vintafolide was wholly ineffective in slowing down or otherwise aiding in the treatment of PROC;

    (b)    The DSBM would reveal vintafolide's ineffectiveness and likely recommend a halt the PROCEED Study due to the ineffectiveness of vintafolide; and

    (c)    As a result of the foregoing, VYNFINIT was not a commercially viable product and the business prospects of Endocyte were at significant risk.

<u>**THE TRUTH IS REVEALED**</u>

34.    On May 2, 2014, the Company shocked the market and admitted that the DSMB found VYNFINIT wholly ineffective in treating PROC or slowing progress of the cancer. As a result of DSMB's findings and recommendation to halt further testing, the Company suspended all screening and randomization of participants in the PROCEED Study.  The press release stated, in relevant part:

> **Merck and Endocyte Announce Independent DSMB Recommends Vintafolide PROCEED Phase 3 Trial Be Stopped for Futility Following Interim Analysis**
>
> WHITEHOUSE STATION, N.J. & WEST LAFAYETTE, Ind., May 2, 2014 -- Merck, known as MSD outside the United States and Canada (NYSE: MRK), and Endocyte, Inc. (NASDAQ: ECYT), today announced that the Data Safety Monitoring Board (DSMB) of the PROCEED trial has completed a pre specified, interim futility analysis and the DSMB recommended that the trial be stopped because vintafolide did not demonstrate efficacy on the pre-specified outcome of Progression-Free Survival (PFS) in patients with platinum-resistant ovarian cancer.  The DSMB did not identify any safety concerns for the patients enrolled in the trial.  Based on the DSMB recommendation and while further review of the data are conducted, the Companies have taken steps to notify investigators that screening and randomization of participants in the trial will be suspended.

35.    Also on May 2, 2014, the Company held an earning conference call with

investors.  During the call, Ellis was asked to disclose the differences between the PRECEDENT Study and the PROCEED Study.  Ellis admitted for the first time that the PRECEDENT Study used RECIST 1.0 while the PROCEED Study used RECIST 1.1.  Ellis stated in relevant part:

> **[Analyst]**
>
> Hey, could you just remind us, with respect to the primary endpoint in PROCEED versus the Phase 2, how PFS was evaluated?  And then is there anything new in PROC that's come along in terms of potential prior treatments that may have impacted the response to Vynfinit?  Thanks.
>
> **Ron Ellis** - Endocyte, Inc. - President and CEO
>
> The PFS measurement -- the two primary differences, Greg, would have been that this -- PROCEED was double-blinded as opposed to investigator-assessed.  Both were investigator-assessed, but this was double-blinded and the PROCEED –PRECEDENT was not.
>
> *We also used the more up-to-date RECIST 1.1, which has a different definition/or target lesions than the RECIST 1.0, which was used in the PRECEDENT study.*

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

36.     Plaintiff brings this action derivatively in the right and for the benefit of Endocyte to redress injuries suffered and to be suffered as a direct and proximate result of the breaches of fiduciary duties and gross mismanagement by the Individual Defendants.

37.     Plaintiff will adequately and fairly represent the interests of Endocyte and its shareholders in enforcing and prosecuting its rights and has retained counsel competent and experienced in derivative litigation.

38.     Plaintiff is a current owners of Endocyte stock and have continuously been an owner of Endocyte stock during all times relevant to the Individual Defendants' wrongful course of conduct alleged herein.  Plaintiff understands his obligation to hold stock throughout the duration of this action and are prepared to do so.

14

39.     During the illegal and wrongful course of conduct at the Company and through the present, the Board consisted of the Individual Defendants. Because of the facts set forth throughout this Complaint, demand on the Endocyte Board to institute this action is not necessary because such a demand would have been a futile and useless act.

40.     The Endocyte Board is currently comprised of ten (10) members – Defendants Ellis, Low, Russell, Meldrum, Brauer, Goddard, Hanham, Kozin, Middleton, and Aplin. Thus, Plaintiff is required to show that a majority of the Demand Defendants, *i.e.*, six (6), cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action.

41.     The Individual Defendants face a substantial likelihood of liability in this action because they caused Endocyte to issue false and misleading statements concerning its financial results and future prospects. Because of their advisory, executive, managerial, and directorial positions with Endocyte, each of the Individual Defendants had knowledge of material non-public information regarding the Company and was directly involved in the operations of the Company at the highest levels.

42.     The Individual Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

43.     The Individual Defendants (or at the very least a majority of them) cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action. For the reasons that follow, and for reasons detailed elsewhere in this complaint, Plaintiff has not made (and should be excused from making) a pre-filing demand on the Board to initiate this action because making a demand would be a futile and

useless act.

44.     Each of the Individual Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein, and are therefore not disinterested parties.

45.     Each of the Individual Defendants authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

46.     Because of their participation in the gross dereliction of fiduciary duties, and breaches of the duties of due care, good faith, and loyalty, Defendant Ellis is unable to comply with his fiduciary duties and prosecute this action.  He is in a position of irreconcilable conflict of interest in terms of the prosecution of this action and defending himself in the securities fraud class action lawsuit brought under the Securities Exchange Act of 1934.

47.     Additionally, each of the Individual Defendants received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of Endocyte.

### The Individual Defendants Are Not Independent or Disinterested

48.     Defendants Ellis and Low are employed by the Company and derive significant income from their employment at the Company and their professional reputations are inextricably bound to their roles at the Company.  As such demand would be futile upon them.

49.     A pre-suit demand on the Board is futile, and therefore, excused.  This is because

16

the Individual Defendants face a sufficiently substantial likelihood of liability since despite knowing that the PRECEDENT Study reported test results which the public and investors naturally believed to be under the current RECIST guidelines when in fact the test results were under the outdated and superseded RECIST 1.0 standards and the PROCEED Study used RECIST 1.1 standards under which failure was far more likely. The Individual Defendants permitted and participated in this misleading promotion of Vintafolide, fully aware that the false and misleading information regarding the drug would substantially harm the Company and its investors.

50. The Individual Defendants face a substantial likelihood of liability for their individual misconduct because throughout the Relevant Period and as such had a fiduciary duty to ensure that the Company's public filings with the SEC, press releases, and other public statements and presentations on behalf of the Company concerning REG 1 were true and not materially misleading. Each of the Director Defendants are highly experienced biopharmaceutical experts and medical professionals who well understand the data they received concerning the testing on the Company's primary product which each of Defendants received in the course of their duties as directors. Defendants knew that Endocyte was highly dependent upon the public perception of the potential of its lead product Vintafolide. Understanding the critical importance of the results of the PRECEDENT Study on the Company's best and most developed prospect, and considering these high stakes, to fulfill their duties owed to the Company the Director Defendants needed to be highly vigilant over and knowledgeable about further developments related to the PRECENDENT study and in fact well understood that the study was virtually meaningless since it had been conducted under outdated RECIST 1.0 guidelines.

51.     Nonetheless, the Individual Defendants reviewed, signed and authorized the Company's 2014 Form 10-K and 2014 Proxy statements filed with the SEC and disseminated to Company shareholders and the investing public, while knowing or recklessly disregarding that those documents were false and/or materially misleading because of the misstatements and material omissions described herein.

52.     Moreover, these Individual Defendants, as directors (and, in some cases, also as Audit Committee members and/or Nominating and Corporate Governance Committee members) owed a duty to, in good faith and with due diligence, exercise reasonable inquiry, oversight, and supervision to ensure that the Company's internal controls and/or internal auditing and accounting controls were sufficiently robust and effective (and/or were being implemented effectively), and to ensure that the Audit Committee's and Nominating and Corporate Governance Committee's duties were being discharged in good faith and with the required diligence and due care. Instead, they knowingly and/or with reckless disregard reviewed and authorized the publication of materially false and misleading statements described herein throughout the Relevant Period that caused the Company's stock to trade at artificially inflated prices.

53.     It may reasonably inferred that the Individual Defendants were aware of the Company's misrepresentations and failure to disclose concerning the truth about Vinatfolide:

> (a)     Defendant Low was nominated to the Board specifically due to his "perspective and experience he brings as [the Company's] Chief Science Officer and as one of [the Company's] co-founders, which brings historic knowledge, scientific expertise and continuity to [the Company's] Board of Directors." SEC Form DEF 14A filed March 25, 2014, at 16.  It is reasonable to infer from this

that Defendant Low was aware of the basic information about the single major test supposedly passed by the Company's primary drug candidate/product.

(b)     Defendant Russell was nominated to the Board specifically due to his extensive life-time experience in clinical-stage biopharmaceutical companies where he has served as a "head of research and development for global branded products," and his "experience in advancing products through late-stage clinical development and in navigating the new drug approval process at the FDA." SEC Form DEF 14A filed March 25, 2014, at 16.  In light of this, it is reasonable to infer that Defendant Russell well understood the difference between a current test and an outdated test regarding the single major test supposedly passed by the Company's primary drug candidate/product.

(c)     Defendant Meldrum was nominated to the Board specifically due to his, "years of experience in the biotechnology, diagnostic and related industries, his expertise in investor relations and his scientific background and industry knowledge." SEC Form DEF 14A filed March 25, 2014, at 17.   Given this knowledge, it is reasonable to infer that Defendant Meldrum acquainted himself with the basic facts concerning the primary clinical test that had supposedly been passed by the Company's primary drug candidate/product, including the basic standard under which the test had been measured and reported.

(d)     Defendant Goddard is a scientist and former researcher at the National Cancer Institute who was nominated to the Board specifically due to "his years of experience in the biotechnology, diagnostic and related industries, and his scientific background and industry knowledge." SEC Form DEF 14A filed March

25, 2014, at 15. Given this background and training, it is reasonable to infer that Goddard was familiar with the fact that Vintafolide had never passed any clinical test under current guidelines.

(e)    Defendant Brauer was nominated to the Board specifically due to his "extensive experience" such that Defendant Brauer is himself a medical investment consultant for investors. Based upon these facts, it is reasonable to infer that Defendant Brauer was aware of the basic facts surrounding the Company's single most touted product and the fact that the supposedly positive clinical test results upon which the hype was based, was an outdated guideline far less stringent than the present guidelines.

54.    The Individual Defendants breached their fiduciary duties by failing to disclose the standards used in the two studies prior to filing with the SEC for the Company to issue millions of new shares in Company stock while taking advantage of the artificially inflated share price. Indeed, the Individual Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Endocyte common stock and operated as a fraud or deceit on purchasers of Endocyte common stock by misrepresenting the Company's business and prospects.

55.    The Individual Defendants have failed to take action against those who are responsible for permitting false and misleading information to be published and promoted that artificially inflated Endocyte stock prices, further deceiving the investing public. No action, legal or otherwise, has been taken against any current or former director or officer in connection with the misleading SEC filings and Company press releases regarding the misleading results of the PRECEDENT Study of Vintafolide. The Individual Defendants have demonstrated their

unwillingness and/or inability to act in compliance with their fiduciary obligations and/or to sue themselves and/or their fellow directors and allies in the top ranks for the Company for the wrongdoing complained of herein. Moreover, the Individual Defendants have thus far attempted to deny that the Company made misleading statements or sought out to inflate stock prices in order to issue millions of new shares in public offerings. Thus, demand on the Board is futile and therefore excused.

56. As particularized herein, to properly prosecute this lawsuit, the Individual Defendants would have to sue themselves, requiring them to expose themselves to millions of dollars in civil liability and/or sanctions for breach of fiduciary duties. This they have refused to do thus far, and will not do in the future. A majority of the Board and the Individual Defendants are exposed to potential liability for misleading the public at large into believing Endocyte's stock was valued at a higher price than what it was truly worth. Thus, demand on the Individual Defendants is futile, and therefore excused.

57. The Endocyte Board is dominated by directors that are specifically implicated in the wrongdoing alleged herein. A majority of the individuals were directors on the Board for the entire period in which Endocyte stock prices were artificially inflated resulting from the promotion of the stock. As a result, the Board is dominated by persons who are specifically implicated in the wrongdoing and therefore, cannot be expected to sue themselves.

### FIRST CAUSE OF ACTION

#### Against The Individual Defendants for Breach of Fiduciary Duties

58. Plaintiff incorporates by reference and re-alleges each and every allegation contained above, as though fully set forth herein.

59. The Individual Defendants owe Endocyte fiduciary obligations. By reason of

their fiduciary relationships, the Individual Defendants owed and owe Endocyte the highest obligation of good faith, fair dealing, loyalty, and due care.

60.    The Individual Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

61.    The Individual Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties. Among other things, the Individual Defendants breached their fiduciary duties of loyalty and good faith by allowing the Company to improperly misrepresent and overstate its profits and failing to correct the Company's publicly reported inaccurate financial guidance. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

62.    As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, Endocyte has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

63.    As a direct and proximate result of the Individual Defendants' breach of their fiduciary duties, Endocyte has suffered damage, not only monetarily, but also to its corporate image and goodwill. Such damage includes, among other things, costs associated with defending securities lawsuits, severe damage to the share price of Endocyte, resulting in an increased cost of capital, the waste of corporate assets, and reputational harm.

## SECOND CAUSE OF ACTION

### Against The Individual Defendants for Gross Mismanagement

64.    Plaintiff incorporate by reference and re-alleges each allegation contained above, as though fully set forth herein.

65.    By their actions alleged herein, the Individual Defendants, either directly or

through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of Endocyte in a manner consistent with the operations of a publicly held corporation.

66.     As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, Endocyte has sustained significant damages in excess of hundreds of millions of dollars.

67.     Because of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

## REQUEST FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment as follows:

A.     Determining that this action is a proper derivative action maintainable under law, and that demand is excused;

B.     Awarding, against all the Individual Defendants and in favor of Endocyte, the damages sustained by the Company as a result of Defendants' breaches of their fiduciary duties;

C.     Directing Endocyte to take all necessary actions to reform and improve its corporate governance and internal procedures, to comply with the Company's existing governance obligations and all applicable laws and to protect the Company and its investors from a recurrence of the damaging events described herein;

D.     Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.     Granting such other and further relief as the Court deems just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury.

DATED: <u>October 31, 2014</u>                    Respectfully submitted,


By: _____
Irwin B. Levin
Richard E Shevitz
Scott D. Gilchrist
**COHEN & MALAD, LLP**
One Indiana Square, Suite 1400
Indianapolis, IN 46204
Telephone: (317) 636-6481
Facsimile: (317) 636-2593
Email: ilevin@cohenandmalad.com
           rshevitz@cohenandmalad.com
           sgilchrist@cohenandmalad.com


Thomas J. McKenna
Gregory M. Egleston
**GAINEY McKENNA & EGLESTON**
440 Park Avenue South
New York, NY  10016
Telephone: (212) 983-1300
Facsimile: (212) 983-0380
Email: tjmckenna@gme-law.com
Email: gegleston@gme-law.com

*Attorneys for Plaintiff*

24

## VERIFICATION

I, Victor Veloso, declare that I have reviewed the Verified Shareholder Derivative Complaint ("Complaint") prepared on behalf of Endocyte, Inc. and authorize its filing. I have reviewed the allegations made in the Complaint, and to those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely on my counsel and their investigation and for that reason believe them to be true. I further declare that I am a current holder, and have been a holder, of Endocyte, Inc. common stock at all relevant times.

10-14-14
Date

Name
VICTOR VELOSO